DAVID C. SHONKA
Acting General Counsel
THOMAS J. WIDOR (DC 490184)
DANIEL DWYER (CA 286701)
Email: twidor@ftc.gov; ddwyer@ftc.gov
FEDERAL TRADE COMMISSION
600 Pennsylvania Ave., NW, Mail Drop CC-10232
Washington, DC 20580
Telephone: (202) 326-3039
Facsimile: (202) 326-3768

THOMAS J. SYTA (CA 116286)
Email: tsyta@ftc.gov
FEDERAL TRADE COMMISSION
10877 Wilshire Blvd., Suite 700
Los Angeles, California 90024
Telephone: (310) 824-4324
Facsimile: (310) 824-4380

Attorneys for Plaintiff
Federal Trade Commission

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>                              Plaintiff,<br><br>              v.<br><br>UNIVERSAL CITY NISSAN, INC., a California Corporation, also d/b/a Universal Nissan;<br><br>SAGE DOWNTOWN, INC., a California Corporation, also d/b/a Kia of Downtown Los Angeles;<br><br>GLENDALE NISSAN/INFINITI, INC., a California Corporation, also d/b/a Glendale Infiniti and d/b/a Glendale Nissan;<br><br>VALENCIA HOLDING CO., LLC, a California Limited Liability Company, also d/b/a Mercedes-Benz of Valencia;<br><br>WEST COVINA AUTO GROUP, LLC, a California Limited Liability Company, also d/b/a | Case no.<br><br><br>**COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF** |

West Covina Toyota and West Covina
Toyota/Scion;

WEST COVINA NISSAN, LLC, a California
Limited Liability Company;

COVINA MJL, LLC, a California Limited
Liability Company, also d/b/a Sage Covina
Chevrolet;

SAGE NORTH HOLLYWOOD, LLC, a
California Limited Liability Company, also d/b/a
Sage Pre-Owned;

SAGE VERMONT, LLC, a California Limited
Liability Company, also d/b/a Sage Hyundai;

SAGE HOLDING COMPANY, INC., a
California Corporation;

SAGE MANAGEMENT COMPANY, INC., a
California Corporation;

JOSEPH SCHRAGE, a/k/a JOSEPH SAGE, in
his individual and corporate capacities;

LEONARD SCHRAGE, a/k/a LEONARD
SAGE, in his individual and corporate capacities;
and

MICHAEL SCHRAGE, a/k/a MICHAEL SAGE,
in his individual and corporate capacities.

Defendants.

Plaintiff, the Federal Trade Commission ("FTC") for its Complaint alleges:

1.     The FTC brings this action under Section 13(b) of the Federal Trade

Commission Act ("FTC Act"), 15 U.S.C. § 53(b); the Truth in Lending Act

("TILA"), 15 U.S.C. §§ 1601-1666j; and the Consumer Leasing Act ("CLA"), 15

U.S.C. §§ 1667-1667f, to obtain temporary, preliminary, and permanent injunctive

relief, rescission or reformation of contracts, restitution, the refund of monies paid,

disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts

or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), TILA

2

and its implementing Regulation Z, 12 C.F.R. § 226; and CLA and its

implementing Regulation M, 12 C.F.R. § 213.

## JURISDICTION AND VENUE

2.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§

1331, 1337(a), and 1345; 15 U.S.C. §§ 45(a), 53(b), and 1607(c).

3.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1), (b)(2),

(c)(1), (c)(2), and (d), and 15 U.S.C. § 53(b).

## PLAINTIFF

4.     Plaintiff FTC is an independent agency of the United States

Government created by statute.  15 U.S.C. §§ 41-58.  The FTC enforces Section

5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or

practices in or affecting commerce.  The FTC also enforces TILA, 15 U.S.C. §§

1601-1666j, which establishes, *inter alia*, disclosure and calculation requirements

for consumer credit transactions and advertisements, and CLA, 15 U.S.C. §§ 1667-

1667f, which establishes, *inter alia*, disclosure and calculation requirements for

consumer lease transactions and advertisements.

5.     The FTC is authorized to initiate federal district court proceedings, by

its own attorneys, to enjoin violations of the FTC Act, TILA, and CLA, and to

secure such equitable relief as may be appropriate in each case, including

rescission or reformation of contracts, restitution, the refund of monies paid, and

the disgorgement of ill-gotten monies.  15 U.S.C. §§ 53(b) and 1607(c).

3

## **DEFENDANTS**

6.     UNIVERSAL CITY NISSAN, INC., also d/b/a Universal Nissan ("Universal City Nissan"), is a California corporation, with its principal place of business at 3550 Cahuenga Blvd. W., Los Angeles, CA, 90068.  Universal City Nissan transacts or has transacted business in this district.  At all times material to this Complaint, acting alone or in concert with others, Universal City Nissan has advertised, marketed, distributed, or offered vehicles to consumers for sale or lease.

7.     SAGE DOWNTOWN, INC., also d/b/a Kia of Downtown Los Angeles ("Kia of Downtown"), is a California corporation, with its principal place of business at 1945 S. Figueroa St., Los Angeles, CA 90007.  Kia of Downtown transacts or has transacted business in this district.  At all times material to this Complaint, acting alone or in concert with others, Kia of Downtown has advertised, marketed, distributed, or offered vehicles to consumers for sale or lease.

8.     GLENDALE NISSAN/INFINITI, INC., also d/b/a Glendale Infiniti and d/b/a Glendale Nissan ("Glendale Nissan"), is a California corporation, with its principal place of business at 727 S. Brand Boulevard, Glendale, CA 91204.  Glendale Nissan transacts or has transacted business in this district.  At all times material to this Complaint, acting alone or in concert with others, Glendale Nissan

4

has advertised, marketed, distributed, or offered vehicles to consumers for sale or lease.

9.    VALENCIA HOLDING COMPANY, LLC, also d/b/a Mercedes-Benz of Valencia ("Mercedes-Benz of Valencia"), is a California limited liability company, with its principal place of business at 2335 Valencia Blvd., Valencia, CA 91355.  Mercedes-Benz of Valencia transacts or has transacted business in this district.  At all times material to this Complaint, acting alone or in concert with others, Mercedes-Benz of Valencia has advertised, marketed, distributed, or offered vehicles to consumers for sale or lease.

10.    WEST COVINA AUTO GROUP, LLC, d/b/a West Covina Toyota and d/b/a West Covina Toyota/Scion ("West Covina Toyota"), is a California limited liability company, with its principal place of business at 1800 E. Garvey Ave. South, West Covina, CA 91791.  West Covina Toyota transacts or has transacted business in this district.  At all times material to this Complaint, acting alone or in concert with others, West Covina Toyota has advertised, marketed, distributed, or offered vehicles to consumers for sale or lease.

11.    WEST COVINA NISSAN, LLC ("West Covina Nissan") is a California limited liability company, with its principal place of business at 205 N. Citrus St., West Covina, CA 91791.  West Covina Nissan transacts or has transacted business in this district.  At all times material to this Complaint, acting

alone or in concert with others, West Covina Nissan has advertised, marketed, distributed, or offered vehicles to consumers for sale or lease.

12.    COVINA MJL, LLC, also d/b/a Sage Covina Chevrolet ("Covina Chevrolet"), is a California limited liability company, with its principal place of business at 635 S. Citrus Ave., Covina, CA 91723.  Covina Chevrolet transacts or has transacted business in this district.  At all times material to this Complaint, acting alone or in concert with others, Covina Chevrolet has advertised, marketed, distributed, or offered vehicles to consumers for sale or lease.

13.    SAGE NORTH HOLLYWOOD, LLC, also d/b/a Sage Pre-Owned ("Sage Pre-Owned"), is a California limited liability company, with its principal place of business at 4110 Lankershim Blvd, North Hollywood, CA 91602.  Sage Pre-Owned transacts or has transacted business in this district.  At all times material to this Complaint, acting alone or in concert with others, Sage Pre-Owned has advertised, marketed, distributed, or offered vehicles to consumers for sale or lease.

14.    SAGE VERMONT, LLC, also d/b/a Sage Hyundai ("Sage Hyundai"), is a California limited liability company, with its principal place of business at 200 N. Vermont Ave, Los Angeles, CA 90004.  Sage Hyundai transacts or has transacted business in this district.  At all times material to this Complaint, acting alone or in concert with others, Sage Vermont has advertised, marketed, distributed, or offered vehicles to consumers for sale or lease.

15.     SAGE HOLDING COMPANY, INC. ("Sage Holding") is a California corporation, with its principal place of business at 3550 Cahuenga Blvd. W., Los Angeles, CA, 90068.  Sage Holding transacts or has transacted business in this district.

16.     SAGE MANAGEMENT CO., INC. ("Sage Management") is a California corporation, with its principal place of business at 3550 Cahuenga Blvd. W., Los Angeles, CA, 90068.  Sage Management transacts or has transacted business in this district.

17.     JOSEPH SCHRAGE, also known as JOSEPH SAGE, is or was a manager, managing member, principal, officer, or owner of Universal City Nissan, Kia of Downtown, Glendale Nissan, Mercedes-Benz of Valencia, West Covina Toyota, West Covina Nissan, Covina Chevrolet, Sage Pre-Owned, Sage Hyundai, Sage Holding, and Sage Management (collectively "Corporate Defendants").  At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.  Joseph Schrage resides in this district.  Joseph Schrage, in connection with the matters alleged herein, transacts or has transacted business in this district.

18.     LEONARD SCHRAGE, also known as LEONARD SAGE, is or was a manager, managing member, principal, officer, or owner of Corporate Defendants.  At all times material to this Complaint, acting alone or in concert with

others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. Leonard Schrage resides in this district. Leonard Schrage, in connection with the matters alleged herein, transacts or has transacted business in this district.

19.    MICHAEL SCHRAGE, also known as MICHAEL SAGE, is or was a manager, managing member, principal, officer, or owner of Corporate Defendants. At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. Michael Schrage resides in this district. Michael Schrage, in connection with the matters alleged herein, transacts or has transacted business in this district.

## COMMON ENTERPRISE

20.    Corporate Defendants have operated as a common enterprise while engaging in the deceptive, unfair, and unlawful acts and practices alleged below. Corporate Defendants have conducted the business practices described below through interrelated companies that have common ownership, officers, managers, business functions, employees, and office locations; that have commingled funds; or that have shared the same outside vendors, including advertising and marketing. Because Corporate Defendants have operated as a common enterprise, each of them is jointly and severally liable for the acts and practices alleged below. Defendants Joseph Schrage, Leonard Schrage, and Michael Schrage have

formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Corporate Defendants that constitute the common enterprise.

## COMMERCE

21.    At all times material to this Complaint, Universal City Nissan, Kia of Downtown, Glendale Nissan, Mercedes-Benz of Valencia, West Covina Toyota, West Covina Nissan, Covina Chevrolet, Sage Pre-Owned, Sage Hyundai, Sage Holding, Sage Management, Joseph Schrage, Leonard Schrage, and Michael Schrage (collectively "Defendants") have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS PRACTICES

22.    Since at least 2010, Defendants have deceptively advertised offers to purchase, finance, and lease vehicles and have engaged in deceptive and unfair practices relating to the lease, sale, and financing of vehicles and add-on products or services.

23.    Defendants have advertised in English, Spanish, and other languages, making enticing claims about key terms, such as low sales prices, low monthly payment amounts, and low down payment amounts.  Defendants have frequently misrepresented these claims and have hidden additional material terms that have significantly qualified or contradicted the prominently advertised terms.  In some

instances, Defendants have only provided these additional terms in English, even when the advertisements otherwise have been presented in another language.

24.     Defendants also have subjected consumers, particularly non-English speakers and individuals with poor credit, to deceptive, misleading, and unfair practices when offering add-on products and services or when arranging financing.

25.     In numerous instances, Defendants have packed additional charges for products and services, known as add-ons ("add-on products") into the amount financed without consumers' informed consent or after deceptively claiming that such add-on products are required as a condition of the purchase or financing of the vehicle or will improve consumers' chances of obtaining financing.

26.     Even after consumers have signed a contract and driven the vehicles off Defendants' lots, Defendants have used deceptive and unfair tactics to pressure consumers to agree to different financing terms or have otherwise refused to honor the contract.  Such tactics are often known as "yo-yo practices."

27.     Defendants have received numerous negative reviews on online websites complaining about Defendants' deceptive and unfair practices.  In numerous instances, Defendants and Defendants' employees have posted positive, five-star reviews of the dealerships on these websites that deceptively purport to be objective or independent.

### Deceptive Advertising

28.     Defendants have disseminated or caused to be disseminated

advertisements promoting the purchase, finance, or lease of vehicles.

29.     Defendants' advertisements, in numerous instances, have targeted consumers with poor credit or consumers who may have difficulty obtaining financing.  For example, Defendants have advertised the following claims:



30.     Defendants have offered motor vehicles for purchase, finance, or lease in television, radio, print, text messaging, and online advertisements in English, Spanish, and other languages.  Defendants' advertisement have made prominent claims about key attractive terms, such as low sales prices, low monthly payment amounts, or low down payment amounts.  In numerous instances, these advertisements conceal or omit other material terms, such as with miniscule fine print or with cursory, inconspicuous disclaimers.

31.     For example, Defendant Universal City Nissan ran newspaper advertisements that prominently offered a 2012 Nissan Versa for $38 down and $38 per month, in both English and Spanish:



11

32.    The fine print at the bottom of the ad reads:

2012 Versa Hatchback 4 Door Automatic – Selling Price $16,910  doc fee 80.00  Acquisition Fee $595   License $210 gross Cap cost $17,505.  $2695 Due at signing.  MSRP $17,755.  Residual $10,118.10.  Mileage per year 12,000.  Term of lease 36 months.  Advanced payment $195.34.  Upfront charge $508.94.  Initial Payment $2695.00.  $38 payment for the first 6 months.  Payment goes to $179.62 for the balance of the lease term.  One at this price.  Model #11412 VIN#285174.

2012 Versa Hatchback.  4 Puertas, Automatico.  Precio de venta $16,901, proceso de documentos $80.00, cuota de adquisicion, $695, licencia $210.  Costo bruto CAP $17,505.  $2695 al momento de firmar.  MSRP $17,755, Residual $10,118.10.  Millago por año 12,000.  Termino de arrendamiento 36 meses, Adelanto $195.34.  Cargo por adelantado $508.94.  Pago inicial $2695.00, $38 pago por los primeros 6 meses.  Pago sube a $179.62 por el balance del termino del arrendamiento.  Uno a este precio.  Modelo # 11412 Vin #314749

33.    Thus, consumers cannot pay only the "$38 down" that is prominently stated.  They must pay $2,695 at signing, which is substantially more than the "$38" stated at the top of the advertisements.

34.    Similarly, consumers cannot pay only $38 per month.  Rather, the $38 payment is limited to the first 6 months.  A consumer must pay $179.62 per month for the remaining 30 months.

35.    The advertisement additionally does not clearly disclose whether the offer is for the purchase or lease of a motor vehicle.  The fine print reveals that the offer is for the lease of a motor vehicle.

36.    Similarly, an advertisement for Kia of Downtown purported to offer to sell a 2012 Kia Rio for $36 down and $36 a month:

12



37.     However, a disclaimer in extremely fine print, literally hidden in the weeds, revealed that the apparent sales offer was actually a lease offer.  Moreover, the low payment "down" was, in fact, only part of more than $1700 "due at start of lease."  The low payment "per month" was actually a payment that escalates after six months to $183 per month.

38. Defendant Mercedes Benz of Valencia ran an advertisement with similar prominent terms of a $55 down payment and $55 monthly payments:



39.     Defendant Mercedes Benz of Valencia only reveals in fine print that the consumer must pay "tax, license, and dealer document fees" in addition to the $55 and that the monthly payment increases after 6 months depending on the purchase price of the motor vehicle:

*$55.00 total down + tax, license and dealer document fees, no security deposit. $55 is also the monthly payment due plus tax for the first 6 months. Payment increases based on purchase price of vehicle after the initial 6 month period. Difference in payments to be made by dealer for first 6 months. On approved credit. Must have 740 beacon score or better to qualify.

40.     Defendant West Covina Nissan mailed consumers an advertisement with similar prominent terms of a $55 down payment and $55 monthly payments:



41.     In fact, the offer is for a lease, $2,654 is due to "drive-off" the vehicle, and the monthly payment is more than $302 after six months.  These facts are buried in fine print at the bottom of the advertisement.

42.     Similarly, an advertisement from Defendant West Covina Toyota purported to offer a Toyota Tacoma for a $55 down payment and $55 monthly payment:



43.     In fact, $654 is due to "drive-off" the vehicle, and the monthly payment after six months is more than $354.  These facts are buried in fine print at the bottom of the advertisement.

44.     Defendant Glendale Nissan placed Spanish-language radio advertisements promoting key attractive terms contradicted by late and inconspicuous disclaimers.  For example, in an advertisement broadcast on Los Angeles-area Univision station 101.9 FM, Glendale Nissan claimed to offer Nissan

Altimas for sale at $0 down or $169 per month.  Glendale Nissan presented these terms near the beginning of the 90-second radio spot and reiterated them near the close of the advertisement.  Glendale Nissan only revealed in the last sentence of the advertisement that the offer is really for a lease rather than a sale, and that instead of $0 down, a consumer would have to pay $3,999 to acquire the vehicle.

45.    Defendant Covina Chevrolet has advertised various vehicles for sale or financing at discounted prices, including, but not limited to, on its website, covinachevrolet.com, and on Facebook.  For example, Defendant has touted a 2015 Chevy Equinox for purchase at $18,488 or for lease at $79 per month.



46.    In this and other advertisements, Defendant has not included additional required information, such as the total amount due prior to or at consummation or by delivery, or the timing of the monthly payments.

47.    Defendant Covina Chevrolet also has referred the consumer to "See Details."  The "See Details" link on either the website or the Facebook post has not disclosed any additional material terms of the offer.

48.    Additionally, in numerous instances, Defendants have advertised prominent terms that are not generally available to consumers.  In numerous

15

instances, the advertised prominent terms are subject to various qualifications or restrictions.  Such qualifications or restrictions have included, for example, being a current General Motors vehicle owner or lessee, being a college graduate, having certain credit scores, or financing with specified banks.  In numerous instances, even if consumers meet all of the qualifications or restrictions, they cannot obtain the advertised discount and price.

49.     For example, Defendant Covina Chevrolet has advertised a 2015 Chevrolet Camaro LS for lease at $89 per month.



50.     However, the advertised monthly payment is not generally available to consumers.  Instead, the advertised monthly payment is subject to various qualifications and restrictions.  One such qualification or restriction includes being a current General Motors vehicle owner or lessee.

51.     In some instances, Defendants have made enticing claims about key terms in other languages, such as Spanish, but have hidden additional material terms in English.

16

52.    For example, Defendant Universal City Nissan has run a Spanish television advertisement promoting a 2014 Nissan Altima for lease at "$99 AL MES" ($99 per month):



53.    Defendant Universal City Nissan has included an English disclaimer in extremely fine print in the Spanish advertisement.  The English disclaimer has indicated that the low monthly payment is subject to various qualifications and restrictions, including a college graduate discount, and a 740 credit score, and a 5-year credit history.  The advertised monthly payment is subject to various qualifications and restrictions, including a college graduate discount, a 740 credit score, and a 5-year credit history.  Thus, the advertised monthly payment is not generally available to consumers.

54.    In numerous instances, Defendants' advertisements also have represented that "We can pay off your trade-in even if you owe on a loan or lease":



17

. . . .



**What if you currently have a vehicle?**
• We can pay off your trade-in even if you owe on a loan or lease.**
• You will have no payments until July 2016.
• You will receive a check for up to $ 9,800 to spend as you wish!*

55.     In fact, if a consumer owes on a trade-in loan or lease, Defendants have added the amount owed on the trade-in vehicle to the new loan or lease balance the consumer must pay.  In some advertisements, Defendants only have revealed in fine print that consumers might still have to pay off their trade-in as part of the new loan or lease balance:

*Up to $9,800 factory cash back available on select models on approved credit. 1st payment due in July 2016 on approved tier 1 or 2 60 months or less through NMAC. Minimum loan amount finance offer of $4,000. **Negative equity may be added to new loan or lease balance. 0 Down, 0 Interest, 0 Payments for 90 day available on approved credit. *On select models.

## Background on Dealer Financing

56.     After a consumer has decided to purchase a vehicle from Defendants, Defendants have presented the consumer with paperwork to sign and close the deal, typically in the dealership's Finance and Insurance ("F&I") office. Defendants typically have offered to arrange financing for the consumer as part of the closing process.

57.     In the F&I office, Defendants typically have promoted add-on products such as extended warranties, Guaranteed Auto Protection ("GAP"), maintenance plans, service contracts, and VIN etching.  The cost of these products may be included in the contract Defendants have prepared to finance the purchase of the motor vehicle.

18

58.     In numerous instances, Defendants have selected and preprinted add-on products on the sales and financing forms, such as the F&I product menus, pre-contract disclosures, and the contract, before discussing or presenting them to the consumer.

## Defendants' Deceptive and Unfair Practices Relating to Add-On Products

59.     In numerous instances, Defendants have charged consumers for add-on products that the consumers did not authorize.  Multiple consumers, for example, have complained that Defendant Covina Chevrolet included a VIN etching fee in their contract that they did not authorize.  Another consumer complained that Universal City Nissan added a $3,400 service warranty to the amount that he financed for the purchase of a vehicle.  The dealership did not tell the consumer about the warranty, and the consumer did not want to purchase it.  Other consumers have reported that Defendants charged them for add-on products that the consumers had rejected.

60.     Information about the add-on products is often included in a stack of of lengthy, complex, highly technical documents presented at the close of a long financing process after an already lengthy process of selecting a car and negotiating over its price.  Consumers report that Defendants' employees, in numerous instances, have rushed consumers through the closing process and have simply indicated to consumers where to sign.  In some cases, Defendants have obtained consumer signatures purporting to indicate assent to purchase add-on

products even though consumers did not, in fact, authorize the purchase.  For instance, a third-party audit found that Defendant Kia of Downtown required consumers to sign for GAP and service contracts regardless of whether the consumers were actually purchasing the add-on products.  The third-party audit also found that other dealerships were having consumers sign blank documents.

61.     In numerous other instances, Defendants have told consumers that they would not be charged the cost of the add-on products.  For example, Defendant West Covina Nissan promised one consumer two years of free oil changes and tire rotations if she purchased the vehicle.  West Covina Nissan, however, charged the consumer $1,000 for the maintenance agreement.  Similarly, Defendant Universal City Nissan offered another consumer two years of free oil changes, telling her that the dealership had no more room to negotiate the car's price but would include this maintenance agreement for free.  Universal City Nissan charged the consumer $1,825 for the maintenance agreement.

62.     In numerous instances, Defendants have told consumers that they could cancel the add-on products within a specified time for a refund.  In numerous instances where consumers have tried to cancel, Defendants have failed to process the paperwork or have claimed to have lost the paperwork, resulting in delayed cancellations or lower refund payments.

63.     In numerous instances, Defendants have deceptively claimed that the purchase of an add-on product, such as GAP insurance or a service contract, is a

condition of the purchase or financing of the vehicle or will improve the consumer's chances of obtaining financing.  For example, Glendale Nissan had offered one consumer a contract with a 5.05% APR, instead of 11.99%, but had represented that the financing company required her to purchase a warranty to receive the lower APR.  In reality, the financing company had not required the warranty.  In October 2015, one customer complained that Defendant Covina Chevrolet represented that he was required to purchase GAP to obtain better financing while another customer complained that Defendant Covina Chevrolet told him that he was required to buy a $900 protection plan to purchase the vehicle.

64.    Indeed, the former General Manager for Defendants Universal City Nissan and Glendale Nissan has stated that the dealerships "improperly charged customers for warranties on automobile transactions in which they were not legally entitled to charge and receive monies from the customers for such guarantees."

### Background on Assigning Financing

65.    Dealers frequently offer financing to consumers looking to purchase a vehicle.  As part of this process, dealers extend financing terms, including the amount financed, term, and annual percentage rate (APR), to the consumer as part of same transaction as the vehicle purchase.  Although the dealer is the creditor on the financing contract, dealers typically do not service the contract and instead seek to assign the contract to a third party, such as a bank, finance company, or credit union (collectively, "finance company").  In such circumstances, dealers typically

attempt to offer financing terms to the consumer that the finance company would accept.

66.     Dealers that engage in this type of lending may allow a consumer to take possession of a vehicle before the financing is assigned.  When third-party financing is not secured, consumers have options:  if a dealer does not assign the contract, a dealer may be obligated to service the contract or to notify the consumer that the deal is cancelled or unwound.  A dealer may then ask the consumer to return the vehicle in exchange for return of the consumer's down payment, trade-in vehicle, or any other consideration provided by the consumer.  Under these circumstances, a consumer is not required to sign a new contract.

### Defendants' Unlawful Practices Relating to Assigning Financing

67.     Even after consumers have signed a contract and driven the vehicles off Defendants' lots, Defendants have used deceptive and unfair tactics to pressure consumers who have financed through Defendants to agree to different financing terms or have otherwise refused to honor the contract.

68.     Here, Defendants have engaged in lending, touting their ability to obtain financing for consumers with poor credit or consumers who may have difficulty obtaining financing.  Defendant West Covina Nissan has claimed that it "specialize(s) in bad credit and high risk auto loans."  Defendant Glendale Nissan has represented that "years of relationship building with the banks," allows them to get consumers "the best financing" and to save consumers' time and "hard earned

22

money."  Instead of negotiating terms a third party financing company would accept, however, Defendants Glendale Nissan and Universal City Nissan have admitted that their dealerships have "approved deals to customers with risky credit before bank financing had been secured in order to increase their sales numbers. . . . knowing that the dealership was not going to be able to secure bank financing on the offered terms."

69.    In many instances, when Defendants have failed to assign financing, instead of providing consumers accurate and truthful information about the deal or abiding by the terms of the contract, Defendants have engaged in "yo-yo tactics" to deceptively or unfairly induce consumers who have signed contracts and driven off the lots with the vehicles to sign new contracts and pay a higher interest rate, make an additional down payment, or agree to other terms that differ materially from the original terms to which the consumer agreed.  In some such instances, Defendants have represented to consumers that they must sign the new contract.  In fact, there is no legal or other requirement that consumers sign a new contract when Defendants have failed to assign financing on the terms to which the consumer agreed in the original contract.

70.    In other instances where Defendants have not assigned financing and have sent notice cancelling the deal, Defendants have represented that they are not required to return any consideration provided by the consumer, including any down payment or trade-in vehicle when the consumer has followed up on the

demand to return the vehicle.  In fact, Defendants legally are required to return consideration provided by the consumer when consumers have sought to return the vehicle in response to Defendants' demand.  Additionally, fine print in Defendants' contract provides that Defendants may cancel the contract if they are unable to assign financing, but to do so, Defendants must give the consumer written or actual notice within 10 days of the intitial contract date.  The contract also provides that if Defendants cancel the contract, they "must give back. . . all consideration received," including any trade-in motor vehicle.  In numerous instances, however, Defendants have refused to return the consumer's down payment or trade-in vehicle promptly or at all.

71.   In numerous other instances where a consumer has requested compliance with the terms of the valid, binding contract or has refused Defendants' unlawful demands to sign a new contract or to return the vehicle, Defendants have refused to comply with the contract.  Instead, Defendants have falsely represented that consumers will be liable for legal action, including lawsuits, repossession, or criminal arrest for a stolen vehicle.

72.   In certain instances where consumers had valid, binding contracts, Defendants actually have had consumers' vehicles repossessed.  In such instances, consumers have been deprived of vital medications or other belongings.

## Deceptive Consumer Reviews

73.     Defendants have received numerous negative reviews on third-party online review and social media websites, such as Facebook, Google+, and Yelp, complaining about their deceptive and unfair practices.

74.     Defendants have used a third-party reputation management company to monitor and manage social media and online reviews.  As part of its monitoring services for Defendants, the reputation management company typically has notified Defendants, including the general managers of the dealerships, when consumer reviews are posted online.  The reputation management company also generally has posted a standard response to consumer reviews and, in numerous instances, has requested approval or has sought guidance on responding to reviews. In numerous instances, Defendants Joseph Schrage or Michael Schrage have been copied on or forwarded these communications.

75.     The reputation management company found in a 2015 consumer survey that 50 percent of those surveyed "ranked review sites as the most influential dealership selection tool" and that 66 percent of car buyers "look at star ratings in search results even if they don't click through to read the reviews."

76.     In numerous instances, Defendants and their employees or agents have posted positive, five-star reviews of the dealerships on these third-party online review and social media websites that purport to be objective or independent.  For example, at least thirteen of Kia of Downtown's five-star

Case 2:16-cv-07329-CAS-AJW   Document 1   Filed 09/29/16   Page 26 of 38   Page ID #:26

Facebook reviews and five of Sage Hyundai's five-star Facebook reviews have been posted by Defendants or Defendants' employees or agents.

77.     Similarly, following a number of negative Yelp reviews about Defendant West Covina Nissan,  Defendant West Covina Nissan's internet manager, his wife, and another manager posted five-star reviews purporting to be objective or independent.  The internet manager's review asserted that a "salesman told me when customers don't get there [sic] price[,] one way they want to get revenge is to put a bad review to taint the reputation of the place."  The internet manager's wife posted a five-star review on the same day as the internet manager.  Her review also addressed Defendant West Covina Nissan's "many negative reviews," stating "auto dealers have a bad rep and most dealers have bad yelp reviews, I will not let it bother, go inn and ask for Internet department and they will take a good car of you [sic]."  Approximately four days later, another manager posted a five-star review.

78.     Defendants' websites also have included reviews from these third-party websites, including reviews from individuals who purport to be, but are not, object or independent consumers.  For example, the landing page for Defendant Kia of Downtown's website, www.kiaofdtla.com, has included a "Review" link that opens a pop-up window of "consumer" reviews collected from ten different online websites.  These  "consumer" reviews include reviews from an internet sales employee.  One of the employee's reviews has stated:

26

I would like to update my review to state that this dealership is truly exceptional and I really appreciate the way they treat their clients. If you have any issues you can just contact the dealership to speak to a manager and they will help resolve any issue you might have. I say this from experience, they are super helpful and they care about their clients a lot.

## VIOLATIONS OF THE FTC ACT

79.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

80.     Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

81.     Acts or practices are unfair under Section 5 of the FTC Act if they cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.  15 U.S.C. § 45(n).

## Count I:
### Misrepresentations Regarding Lease, Credit, or Purchase Terms

82.     In numerous instances, through the means described in Paragraphs 28-55 Defendants have represented, directly or indirectly, expressly or by implication, that:

(a)     Consumers can finance or lease vehicles for prominently advertised monthly payment amounts;

(b)     Consumers can finance or lease vehicles for prominently advertised down payments or amounts due at signing; or

27

(c)     Vehicles are generally available to consumers at prominently advertised terms, such as price.

(d)     Defendants will pay off the consumer's trade-in even if the consumer owes money on the trade-in vehicle loan or lease.

83.     In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 82 of this Complaint:

(a)     Consumers cannot finance or lease vehicles for the prominently advertised monthly payment amounts.  The specified monthly payment amounts are limited to the first six months and increase substantially thereafter.

(b)     Consumers cannot finance or lease vehicles for the prominently advertised down payments or amounts due at signing. Consumers must pay substantially more than the prominently advertised down payment amount or the amount due at signing.

(c)     The vehicles are not available at the prominently advertised terms, such as price, or are not generally available to consumers at such terms.

(d)     Defendants do not pay off the consumer's trade-in even if the consumer owes money on the trade-in vehicle loan or lease. Instead, Defendants include the amount owed on the trade-in

vehicle in the loan or lease for the newly purchased or leased vehicle.

84.     Therefore, the making of the representations as set forth in Paragraph 82 of this Complaint constitutes a deceptive act or practice in or affecting commerce in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**Count II:**
**Misrepresentations Regarding Advertised Transaction**

85.     In numerous instances, through the means described in Paragraphs 28-55 Defendants have represented, directly or indirectly, expressly or by implication, that consumers can finance the purchase of vehicles for the prominently advertised terms.

86.     In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 85 of this Complaint, consumers cannot finance the purchase of vehicles for the prominently advertised terms.  The prominently advertised terms are components of lease offers and not credit offers.

87.     Therefore, the making of the representations as set forth in Paragraph 85 of this Complaint constitutes a deceptive act or practice in or affecting commerce in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**Count III:**
**Misrepresentations Regarding Add-On Products**

88.     In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of vehicles or the financing of automotive

loans, Defendants have represented, directly or indirectly, expressly or by implication, that (a) charges appearing on the contract for the purchase of the vehicle are authorized by consumers, (b) consumers would not be charged the cost of add-on products, or (c) add-on products are required to purchase or finance the vehicle or will improve the consumer's chances of obtaining financing.

89.     In truth and in fact, in numerous instances in which Defendants have made the representation set forth in Paragraph 88 of this Complaint, (a) charges appearing on the contract for the purchase of the vehicle include add-on products that consumers had not authorized, (b) consumers are charged the cost of add-on products, and (c) add-on products are not required to purchase or finance the vehicle and will not improve the consumer's chances of obtaining financing.

90.     Therefore, Defendants' representations as set forth in Paragraph 88 of this Complaint are false or misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## Count IV:
## Unfair Practices Regarding Add-On Products

91.     In numerous instances, Defendants have charged consumers for add-on products for which consumers have not provided express, informed consent.

92.     Defendant's practices as described in Paragraph 91 cause or are likely to cause substantial injury to consumers that consumers themselves cannot reasonably avoid and that is not outweighed by countervailing benefits to

consumers or competition.

93.     Therefore, Defendants' practices as described in Paragraph 91 constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. §§ 45(a) and 45(n).

### Count V:
### Deceptive Yo-Yo Practices

94.     In numerous instances after a consumer has signed a contract to finance a vehicle, Defendants have represented, directly or indirectly, expressly or by implication, that (a) the consumer is required to sign a new contract, (b) Defendants are not required to return any consideration provided by the consumer, including any down payment or trade-in vehicle, after demanding return of the vehicle, or (c) the consumer will be liable for legal action, including lawsuits, lawful repossession, criminal arrest, or debt collection if the consumer does not return the vehicle.

95.     In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 94 of this Complaint, (a) the consumer is not required to sign a new contract, (b) Defendants are required to return any consideration provided by the consumer, including any down payment or trade-in vehicle, after demanding return of the vehicle, and (c) the consumer will not be liable for legal action, including lawsuits, lawful repossession, criminal arrest, or debt collection if the consumer does not return the vehicle.

96.     Therefore, Defendants' representations as set forth in Paragraph 94 of this Complaint are false or misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## Count VI:
## Unfair Yo-Yo Practices

97.     In numerous instances, Defendants (a) have refused to return or return promptly consideration provided by the consumer, including any down payment or trade-in, when Defendants have demanded return of the vehicle or (b) have or have threatened to refer consumers for arrest or criminal prosecution, report the motor vehicle as stolen, or repossess the motor vehicle when a consumer has requested compliance with the terms of the valid, binding contract or has refused Defendants' unlawful demands to sign a new contract or to return the vehicle.

98.     Defendants' actions have caused or are likely to cause substantial injury to consumers that consumers themselves cannot reasonably avoid and that is not outweighed by any countervailing benefits to consumers or competition.

99.     Therefore, Defendants' practices as described in Paragraph 97 constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. §§ 45(a) and 45(n).

## Count VII
## Deceptive Consumer Reviews

100.   In numerous instances, through the means described in Paragraphs 73-78, Defendants have represented, directly or indirectly, expressly or by

32

implication, that persons who have posted or provided reviews or other information about Defendants' products and services are objective or independent.

101.   In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 100, the persons who have posted or provided the reviews or other information are not objective or independent.

102.   Therefore, the making of the representations as set forth in Paragraph 100 of this Complaint constitutes a deceptive act or practice in or affecting commerce in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**VIOLATIONS OF THE TRUTH IN LENDING ACT AND REGULATION Z**

103.   Under Section 144 of the TILA and Section 226.24(d) of Regulation Z, as amended, advertisements promoting closed-end credit in consumer credit transactions are required to make certain disclosures ("TILA additional terms") if they state any of several terms, such as the monthly payment ("TILA triggering terms").

104.   Defendants' advertisements promote closed-end credit, including but not necessarily limited to those described in Paragraphs 28-55, and Defendants are subject to the requirements of the TILA and Regulation Z.

**Count VIII:**
**Failure to Disclose or Disclose Clearly and**
**Conspicuously Required Credit Information**

105.   Defendants' advertisements promoting closed-end credit, including, but not limited to, those described in Paragraphs 28-55 have included TILA

triggering terms, but have failed to disclose, and/or failed to disclose clearly and conspicuously, TILA additional terms required by the TILA and Regulation Z, including one or more of the following:

  (a) The amount or percentage of the down payment;

  (b) The terms of repayment, which reflect the repayment obligations over the full term of the loan, including any balloon payment; and

  (c) The "annual percentage rate," using that term, and, if the rate may be increased after consummation, that fact.

106. Therefore, the practices as set forth in Paragraph 105 of this Complaint have violated Section 144 of the TILA, 15 U.S.C. § 1664, and Section 226.24(d) of Regulation Z, 12 C.F.R. §226.24(d), as amended.

## VIOLATIONS OF THE CONSUMER LEASING ACT & REGULATION M

107. Under Section 184 of the CLA and Section 213.7 of Regulation M, advertisements promoting consumer leases are required to make certain disclosures ("CLA additional terms") if they state any of several terms, such as the amount of any payment ("CLA triggering terms").  15 U.S.C. § 1667c; 12 C.F.R. § 213.7.

108. Defendants' advertisements promoting consumer leases, including but not necessarily limited to those described in Paragraph 107, are subject to the requirements of the CLA and Regulation M.

## Count IX:
### Failure to Disclose or to Disclose Clearly and Conspicuously Required Lease Information

109.   Defendants' advertisements promoting consumer leases, including but not necessarily limited to those described in Paragraphs 28-55, have included CLA triggering terms, but have failed to disclose or to disclose clearly and conspicuously CLA additional terms required by the CLA and Regulation M, including one or more of the following:

(a)    That the transaction advertised is a lease;

(b)    The total amount due prior to or at consummation or by delivery, if delivery occurs after consummation;

(c)    Whether or not a security deposit is required;

(d)    The number, amount, and timing of scheduled payments; and

(e)    With respect to a lease in which the liability of the consumer at the end of the lease term is based on the anticipated residual value of the property, that an extra charge may be imposed at the end of the lease term.

110.   Therefore, the practices as set forth in Paragraph 109 of this Complaint have violated Section 184 of the CLA, 15 U.S.C. § 1667c, and Section 213.7 of Regulation M, 12 C.F.R. §213.7.

### CONSUMER INJURY

111.   Consumers have suffered and will continue to suffer substantial injury

as a result of Defendants' violations of the FTC Act, TILA, Regulation Z, the CLA, and Regulation M.  In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices.  Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

112.   Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC.  The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

## PRAYER FOR RELIEF

Wherefore, Plaintiff Federal Trade Commission, pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), TILA and its implementing Regulation Z, 12 C.F.R. § 226, CLA and its implementing Regulation M, 12 C.F.R. § 213, and the Court's own equitable powers, requests that the Court:

A.    Award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency

of this action, and to preserve the possibility of effective final relief, including but not limited to a temporary and preliminary injunction;

B.    Enter a permanent injunction to prevent future violations of the FTC Act, TILA, Regulation Z, the CLA, and Regulation M by Defendants;

C.    Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act, TILA, Regulation Z, the CLA, and Regulation M, including but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

D.    Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Dated:    9/29/2016          Respectfully submitted,


DAVID C. SHONKA
Acting General Counsel


THOMAS J. WIDOR
Email: twidor@ftc.gov
DANIEL DWYER
Email: ddwyer@ftc.gov
FEDERAL TRADE COMMISSION
600 Pennsylvania Ave., NW
Mail Drop CC-10232
Washington, DC 20580

37

Telephone: (202) 326-3039
Facsimile: (202) 326-3768

THOMAS J. SYTA (CA 116286)
Email: tsyta@ftc.gov
FEDERAL TRADE COMMISSION
10877 Wilshire Blvd., Suite 700
Los Angeles, California 90024
Telephone: (310) 824-4324
Facsimile: (310) 824-4380

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION