DAVID C. SHONKA
Acting General Counsel
THOMAS J. WIDOR (DC 490184)
DANIEL DWYER (CA 286701)
FEDERAL TRADE COMMISSION
600 Pennsylvania Ave., NW, Mail Drop CC-10232
Washington, DC 20580
Telephone:  (202) 326-3039
Facsimile:   (202) 326-3768
Email: twidor@ftc.gov; ddwyer@ftc.gov

THOMAS J. SYTA (CA 116286)
FEDERAL TRADE COMMISSION
10877 Wilshire Blvd., Suite 700
Los Angeles, California 90024
Telephone:  (310) 824-4324
Facsimile:   (310) 824-4380
Email: tsyta@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>                              Plaintiff,<br><br>          v.<br><br>UNIVERSAL CITY NISSAN, INC., et al.<br><br>                              Defendants. | Case no. 2:16-cv-07329-CAS(AJWx)<br>*Honorable Christina A. Snyder*<br><br>**FEDERAL TRADE COMMISSION'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date: November 14, 2016<br>Time: 10:00 a.m.<br>Courtroom: 5, 312 N. Spring St. |

# TABLE OF CONTENTS

I.    INTRODUCTION ......................................................................................1

II.   DEFENDANTS ........................................................................................3

A.    Corporate Defendants..............................................................................3

B.    Individual Defendants .............................................................................3

III.  PRELIMINARY INJUNCTION STANDARD ......................................4

IV.   DEFENDANTS FOR YEARS HAVE DECEIVED CONSUMERS WITH
      BLATANTLY UNLAWFUL ADVERTISING AND PHONY REVIEWS ..5

A.    Defendants Have Deceived Consumers in Violation of the FTC Act. ...........5

   1.   Defendants Have Disseminated a Variety of Deceptive Ads. .....................6

   i.    Defendants Have Deceptively Advertised Key Terms Such As Low
   Down Payments and Low Monthly Payments. ...................................................6

   ii.   Defendants Have Deceptively Advertised That an Offer is for the
   Purchase of a Car...............................................................................................8

   iii.  Defendants Have Deceptively Advertised Offers that Are Not Generally
   Available to Consumers. ....................................................................................9

   iv.   Defendants Have Deceptively Advertised That That They Will Pay Off a
   Consumer's Trade-in Even if the Consumer Owes Money on the Existing
   Loan or Lease. .................................................................................................10

   2.   Defendants Have Posted and Promoted Deceptive Consumer Testimonials
   and Endorsements. ...........................................................................................11

B.    Defendants Have Violated TILA and the CLA.............................................15

C.    Corporate Defendants Have Operated as a Common Enterprise and Thus Are
      Each Jointly and Severally Liable..............................................................16

D.    Individual Defendants Are Liable for Injunctive and Monetary Relief.........17

V. A PRELIMINARY INJUNCTION AGAINST DEFENDANTS IS NEEDED
      TO HALT DEFENDANTS' ILLEGAL PRACTICES ................................20

i

A.   The Commission Is Likely to Succeed on the Merits. ...................................20

B.   The Balance of Equities Favors Injunctive Relief. ........................................20

C.   The Scope of the Proposed Preliminary Injunction Is Necessary and
     Appropriate in Light of Defendants' Egregious, Unlawful Conduct.............22

VI.  CONCLUSION.................................................................................................25

ii

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**CASES**

*Athleta, Inc.* v. *Pitbull Clothing Co.*, No. CV 12-10499-CAS (FMOx), 2013
WL 142877 (C.D. Cal. Jan. 7, 2013).................................................5

*Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389 (9th Cir. 1984) ...................................5

*FTC v. Affordable Media, LLC*, 179 F.3d 1228 (9th Cir. 1999)...............3, 5, 22, 23

*FTC v. Am. Tax Relief LLC*, No. CV 11-6397 DSF (PJWx), 2012 WL
8281722 (C.D. Cal. Aug. 8, 2012)...................................................7

*FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564 (7th Cir. 1989) .......................20, 21

*FTC v. Applied Mktg. Sciences, LLC*, No. CV13-06794 CAS (CWx), slip op.
(C.D. Cal. Sept. 16, 2013) ................................................................2

*FTC v. Benning*, 2010 WL 2605178 (N.D. Cal. June 28, 2010) ............................21

*FTC v. Bronson Partners, LLC*, 564 F. Supp. 2d 119 (D. Conn. 2008).................17

*FTC v. Cantkier*, No. 1:09-cv-00894 (CKK) (D.D.C. May 15, 2009) ...................26

*FTC v. City W. Advantage, Inc.*, 2008 WL 2844696 (D. Nev. July 22, 2008)........24

*FTC v. Colgate-Palmolive*, 380 U.S. 374 (1965) ......................................................7

*FTC v. Commerce Planet, Inc.*, 878 F. Supp. 2d 1048 (C.D. Cal. 2012)...............21

*FTC v. Cornerstone and Co.,* No. 1:14-cv-01479-RC, slip op. (D.D.C. Aug.
29, 2014).........................................................................................26

*FTC v. Cyberspace.com, LLC,* 453 F.3d 1196 (9th Cir. 2006) ..................6, 7, 8, 22

*FTC v. Cyberspy Software, LLC*, No. 6:08-cv-1872-Orl-31GJK, 2008 WL
5157718 (M.D. Fla. Nov. 25, 2008) ..................................................3

*FTC v. Data Med. Capital, Inc.*, 2010 WL 1049977 (C.D. Cal. Jan. 15,
2010) ................................................................................................12

*FTC v. Evans Products Co.*, 775 F.2d 1084 (9th Cir. 1985) .....................................5

*FTC v. Five-Star Auto Club, Inc.*, 97 F. Supp. 2d 502 (S.D.N.Y. 2000).....12, 20, 23

*FTC v. Gill*, 265 F.3d 944 (9th Cir. 2001).................................................................6

iii

*FTC v. Grant Connect, LLC*, 827 F. Supp. 2d 1199 (D. Nev. 2011) ....................16

*FTC v. J.K. Publ'ns, Inc.*, 99 F. Supp. 2d 1176 (C.D. Cal. 2000)...................18, 19

*FTC v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052 (C.D. Cal. Apr. 20, 2012)...............................................................................................7

*FTC v. John Beck Amazing Profits, LLC*, No. CV-09-4719-FMC-FFMx, 2009 WL 7844076 (C.D. Cal. Nov. 17, 2009) ...........................................3, 24

*FTC v. Johnson*, No. 2:10-cv-02203-RLH-GWF, slip op. (D. Nev. Feb. 10, 2011) .......................................................................................................3

*FTC v. Kennedy*, 574 F. Supp. 2d 714 (S.D. Tex. 2008)........................................19

*FTC v. LeanSpa, LLC*, No. 3:11-CV-1715, 2015 WL 1004240 (Mar. 5, 2015) .......................................................................................................17

*FTC v. Lights of Am., Inc.*, 2013 WL 5230681 (C.D. Cal., Sept. 17, 2013) .8, 12, 13

*FTC v. Mallett*, 818 F. Supp. 2d 142 (D.D.C. 2011) ..............................................23

*FTC v. Neovi, Inc.*, 598 F. Supp. 2d 1104 (S.D. Cal. 2008) ...................................19

*FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127 (9th Cir. 2010) .......................19

*FTC v. Pantron I Corp.*, 33 F.3d 1088 (9th Cir. 1994) ......................................7, 22

*FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168 (9th Cir. 1997).................3, 20

*FTC v. Ross*, 897 F. Supp. 2d 369 (D. Md. 2012) ..................................................21

*FTC v. Stefanchik*, 559 F.3d 924 (9th Cir. 2009)...............................5, 6, 20, 22

*FTC v. Stefanchik*, No. C04-1852RSM, slip op. (W.D. Wash. Oct. 20, 2004)........3

*FTC v. Stuffingforcash.com Corp.*, No. 1:02-cv-05022-CRN, slip op. (N.D. Ill. Aug. 26, 2002).....................................................................................26

*FTC v. USA Fin., LLC,* 415 Fed.Appx. 970 (11th Cir. 2011) ..................................9

*FTC v. Warner Commc'ns, Inc.*, 742 F.2d 1156  (9th Cir. 1984)...........................23

*FTC v. World Travel Vacation Brokers*, 861 F.2d 1020 (7th Cir. 1988) ...............27

*FTC v. World Wide Factors, Ltd.*, 882 F.2d 344 (9th Cir. 1989).................5, 23, 24

*In re Cliffdale Associates, Inc.*, 103 F.T.C. 110 (1984)...........................................7

*Nat. Dynamics Corp. v. FTC*, 492 F.2d 1333 (2d Cir. 1974) .................................12

*SEC v. Unifund SAL*, 910 F.2d 1028 (2d Cir. 1990)................................................26

*Standard Oil Co. of Ca. v. FTC*, 577 F.2d 653 (9th Cir. 1978)................................8

*The Wimbledon Fund, SPC v. Graybox, LLC*, 2015 WL 5822580 (C.D. Cal.
     Sept. 29, 2015) ................................................27

**RULES**

12 C.F.R. § 213.7 ................................................15, 16

12 C.F.R. § 226.24(b)-(d) ................................................15

16 C.F.R. § 255.5 ................................................15

**STATUTES**

15 U.S.C. § 1607 ................................................4

15 U.S.C. § 45(a) ................................................1, 5

15 U.S.C. § 53(b) ................................................4

15 U.S.C. §§ 1601-1666j ................................................1

15 U.S.C. §§ 1667-1667f ................................................1

v

## I. INTRODUCTION

For years, Defendants have engaged in a sustained campaign of deceptive advertising and fake online reviews in violation of the FTC Act, the Truth in Lending Act ("TILA"), and the Consumer Leasing Act ("CLA"). Defendants have flouted the law and brazenly continued to employ deceptive ads and online reviews even while the Federal Trade Commission ("FTC") and other law enforcement agencies have brought numerous actions halting these types of deceptive practices. Given Defendants' ongoing, unlawful conduct, the FTC moves for a preliminary injunction to halt Defendants' violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), TILA, 15 U.S.C. §§ 1601-1666j, and the CLA, 15 U.S.C. §§ 1667-1667f.

Defendants, which include nine dealerships collectively known as "Sage Auto" and their three individual owners, deceptively advertise through a variety of media, including television, radio, print, and online marketing. Their advertising has targeted non-English speakers as well as financially distressed consumers, emphasizing, for example, that the dealerships accept all credit applications and help everyone regardless of bad credit, bankruptcy, or repossession. Decl. of FTC Investigator Joseph D. Weber, Jr., attached as Plf's Ex. 1 (hereinafter, "PX1") ¶ 33. Defendants have employed textbook examples of unlawful, deceptive advertising: in many instances, they have misrepresented key terms or hidden additional material language that significantly qualified or contradicted the prominently advertised terms. They have deceptively presented discounts and prices that were not available to the typical consumer and have deceptively advertised purchase offers that are actually leases. Defendants also have claimed that they would pay off a consumer's trade-in vehicle when the consumer purchased or leased a car, only to charge consumers for any amount owed on the trade-in. And just after the FTC filed its Complaint, Defendants ran an egregious advertisement targeting Spanish-speaking consumers. PX1 ¶¶ 45-47. Many of Defendants' advertisements not only violate the FTC Act but also TILA and the CLA.

1

Defendants also have posted and used phony online reviews. In numerous instances, Defendants' employees or agents have posted positive, five-star reviews that purport to be independent and objective on websites such as Facebook, Google+, and Yelp. Defendants have cited these reviews as evidence of the quality of their services and have used these reviews to attempt to discredit or neutralize the many consumer complaints and negative reviews exposing their deceptive advertising and other unlawful acts and practices, including egregious add-on and yo-yo financing tactics.[1] These reviews are often fake and do not disclose the material fact that they are written by Defendants' employees or agents.

A preliminary injunction is needed to stop Defendants from continuing to perpetrate their deceptive acts and practices. The FTC therefore presently seeks a preliminary injunction order from this Court on Complaint Counts I-II and VII-IX. Courts have routinely entered the FTC's motions for temporary or preliminary relief in similar circumstances in this district and elsewhere. *See, e.g.*, *FTC v. Applied Mktg. Sciences, LLC*, No. CV13-06794 CAS (CWx), slip op. (C.D. Cal. Sept. 16, 2013) (ex parte TRO, stipulated preliminary injunction ("PI") with asset freeze, records preservation, new business reporting) *FTC v. John Beck Amazing Profits, LLC*, No. CV-09-4719-FMC-FFMx, 2009 WL 7844076 (C.D. Cal. Nov. 17, 2009) (PI with monitor); *FTC v. Johnson*, No. 2:10-cv-02203-RLH-GWF, slip op. (D. Nev. Feb. 10, 2011) (PI with removal of deceptive websites, asset freeze); *FTC v. Cyberspy Software, LLC*, No. 6:08-cv-1872-Orl-31GJK, 2008 WL 5157718 (M.D. Fla. Nov. 25, 2008) (PI with website and records preservation); *FTC v. Stefanchik*, No. C04-1852RSM, slip op. (W.D. Wash. Oct. 20, 2004) (PI with

---

[1] *See* Compl. ¶¶ 56-64 (discussing add-on allegations) and ¶¶ 65-72 (discussing yo-yo allegations). The deceptive and unfair add-on and yo-yo acts and practices are the subject of Counts III-VI. This motion seeks relief as to the FTC's deceptive advertising and online review claims (Counts I-II and VII-IX).

notice of financial transactions, record keeping, and compliance monitoring; *see also FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1232-33 (9th Cir. 1999) (ex parte TRO, preliminary injunction, asset freeze, accounting); *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1170 (9th Cir. 1997) (ex parte TRO, preliminary injunction).

## II. DEFENDANTS

### A.  Corporate Defendants

The defendant companies consist of nine dealerships, a holding company, and a management company: Universal City Nissan, Inc., Glendale Nissan Infiniti, Inc., Sage Downtown, Inc.(d/b/a Kia of Downtown Los Angeles), Valencia Holding Company, LLC (d/b/a Mercedes Benz of Valencia), West Covina Auto Group, LLC (d/b/a West Covina Toyota),[2] West Covina Nissan, LLC, Covina MJL, LLC (d/b/a Sage Covina Chevrolet), Sage Vermont, LLC (d/b/a Sage Hyundai), Sage North Hollywood, LLC (d/b/a Sage Pre-Owned), Sage Holding Company, Inc., and Sage Management, Inc. (collectively, "Corporate Defendants").  *See* Compl. ¶¶ 6-16.  Representing themselves to the public as "Sage Auto Group" or the "Sage Dealerships," PX1 Atts. EL at 639, 642, 668-85, EN at 740-42, EO at 756, EP at 769, 793-97, Defendants operate as a common enterprise in the Los Angeles metropolitan area offering motor vehicles for purchase, finance, or lease.  The Corporate Defendants share common management and control, utilize overlapping employees and vendors, share business functions, and commingle funds. *See infra* at 16-17.

### B.  Individual Defendants

Joseph, Leonard, and Michael Schrage (collectively, "Individual

---

[2] The West Covina Toyota dealership was sold to a third party in August 2014, PX1 ¶ 18, but West Covina Auto Group LLC continues to operate as a legal entity and as part of the common enterprise.  *See*, *e.g.*, PX1 Att. EP at 775-76, and 831.

1   Defendants") own and control the Corporate Defendants.  PX1 ¶ 17 and Att. M at
2   68-73.  Through a set of family trusts and holding companies, the Individual
3   Defendants each possess about a 33% interest in the Corporate Defendants.  *Id.* ¶
4   17 and Atts. M at 68-73, EL at 617, EN at 734, EO at 751.  The Individual
5   Defendants closely control the dealerships as directors and managers of the various
6   entities and have been involved in the business operations.  *See infra* at 17-19.

7   **III. PRELIMINARY INJUNCTION STANDARD**

8        Pursuant to Section 13(b) of the FTC Act, the Court may grant preliminary
9   and permanent injunctive relief sought by the FTC.  15 U.S.C. § 53(b).  Incident to
10  its authority to issue permanent injunctive relief, Section 13(b) empowers the
11  Court to exercise the full breadth of its equitable authority, including preliminary
12  relief, to ensure final relief is complete and meaningful.  *See FTC v. Stefanchik*,
13  559 F.3d 924, 931 (9th Cir. 2009).  Section 13(b) provides that "the Commission
14  may seek, and after proper proof, the court may issue, a permanent injunction"
15  against violations of "any provision of law enforced by" the FTC.  *Id*.  The Ninth
16  Circuit has long recognized that any case alleging violations of a law enforced by
17  the FTC is a proper case for which injunctive relief may be sought.  *See FTC v.
18  Evans Products Co.*, 775 F.2d 1084, 1086-87 (9th Cir. 1985).  In addition to the
19  FTC Act, these laws include TILA and the CLA.  15 U.S.C. § 1607.

20       To determine whether to grant a preliminary injunction in a Section 13(b)
21  case, the Court considers whether (1) the FTC is likely to succeed on the merits
22  and (2) the equities weigh in favor of an injunction.  *Affordable Media, LLC*, 179
23  F.3d at 1233.  Unlike private litigants, the FTC need not show irreparable injury
24  because it is presumed in a statutory action; thus, the Court "need only. . . find
25  some chance of probable success on the merits" to grant an injunction.  *FTC v.
26  World Wide Factors, Ltd.*, 882 F.2d 344, 347 (9th Cir. 1989); *see also Affordable
27  Media, LLC,* 179 F.3d at 1233.  In considering a preliminary injunction motion, the
28  Court has discretion to consider and accept hearsay evidence.  *Flynt Distrib. Co. v.*

4

*Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984); *Athleta, Inc.* v. *Pitbull Clothing Co.*, No. CV 12-10499-CAS (FMOx), 2013 WL 142877, at *8 (C.D. Cal. Jan. 7, 2013). A preliminary injunction should issue because the FTC is likely to succeed in proving Defendants have violated and continue to violate the FTC Act, TILA, and the CLA and because the public interest favors entry of the requested order.

## IV.  DEFENDANTS FOR YEARS HAVE DECEIVED CONSUMERS WITH BLATANTLY UNLAWFUL ADVERTISING AND PHONY REVIEWS

Although the FTC need only establish likely success on the merits, the evidence powerfully demonstrates that Defendants' advertising is facially deceptive and violates the FTC Act, TILA, and the CLA.  The evidence also shows that, far from remediating these violations in the face of consumer complaints and governmental scrutiny, Defendants have continued undettered.  Defendants instead have tried to disguise their contumacious conduct, in part, through fake online reviews that violate the FTC Act by purporting to be independent and objective.

*A.  Defendants Have Deceived Consumers in Violation of the FTC Act.*

Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."  An act or practice is deceptive under Section 5 if there is a representation, omission, or practice that is likely to mislead consumers acting reasonably under the circumstances, and that is material to the consumer's decision.  *Stefanchik*, 559 F.3d at 928; *FTC v. Cyberspace.com, LLC,* 453 F.3d 1196, 1199 (9th Cir. 2006); *FTC v. Gill*, 265 F.3d 944, 950 (9th Cir. 2001).  A representation, omission, or practice "is material if it 'involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product.'"  *Cyberspace.com*, 453 F.3d at 1201 (quoting *In re Cliffdale Associates, Inc.*, 103 F.T.C. 110, 165 (1984)).

Both express claims and deliberately made claims are presumed material. *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095-96 (9th Cir. 1994); *FTC v. Colgate-Palmolive*, 380 U.S. 374, 391-92 (1965); *FTC v. Am. Tax Relief LLC*, No. CV 11-

5

6397 DSF (PJWx), 2012 WL 8281722, at *3 (C.D. Cal. Aug. 8, 2012); *FTC v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052, 1066 (C.D. Cal. Apr. 20, 2012) ("The law does not recognize any distinction between express and implied misleading claims.").  An advertisement may be "likely to mislead by virtue of the net impression it creates even though [it] contains truthful disclosures." *Cyberspace.com*, 453 F.3d at 1200.

**1.    Defendants Have Disseminated a Variety of Deceptive Ads.**

Defendants have repeatedly engaged in at least four kinds of facially deceptive advertising involving:

i.    key terms such as low down payments and low monthly payments,

ii.    offers for the purchase of a car that are, in fact, lease offers,

iii.    offers that are not generally available to consumers, and

iv.    offers to pay off the amount owed on a consumer's trade-in vehicle when in fact the consumer must pay this amount.

**i.    Defendants Have Deceptively Advertised Key Terms Such As Low Down Payments and Low Monthly Payments.**

Defendants have deceptively advertised since at least 2010 that a consumer can obtain a motor vehicle with a low down payment or low monthly payment. PX1 ¶ 29 and Atts. Q-AD at 112-65.  For example, an advertisement for Universal City Nissan purported to offer a Nissan Altima for "$38 down" and "$38 a month." *Id.* Att. R at 115.  These express claims are false.  In fact, more than $2,695 is due at signing, along with an advance payment of $184.22 and an upfront charge of $590.25, and the monthly payment is $169 per month after the first six months.  *Id.* The true terms of the offer are only disclosed in buried, fine print that consumers are unlikely to notice and that is difficult to read.  *Id.*; *see also* PX1 ¶ 29 and Atts. S at 117, Z at 132, AA at 134 (advertising $55 down and $55 per month where the fine print revealed a higher down payment and a monthly payment spike after six months); Atts. T at 119, X at 127, Y at 129-30 (similar down and monthly payment

6

claims); Att. U at 121 (similar monthly payment claim).  Defendant Kia of Downtown has continued such deceptive advertisements, recently promoting, for example, a 2016 Kia Forte LX for $0 down, even though $4,999 was required at signing.  PX1 ¶¶ 29, 42, Att. AD at 164 (prominently advertising low terms and only later, buried in fine-print, stating true higher terms); *see also* Att. Q at 112-13 (July 2016 advertisement promoting zero down and no deposit, but requiring $119-$289 at signing).  Fine-print disclaimers do not cure Defendants' deceptive representations when prominently advertised payment terms are false or significantly qualified.  *See Standard Oil Co. of Ca. v. FTC*, 577 F.2d 653, 659 (9th Cir. 1978); *Cyberspace.com*, 453 F.3d at 1200.  And the amount a consumer must pay is material to and likely to affect a consumer's purchasing decision.  *See FTC v. Lights of Am., Inc.*, 2013 WL 5230681, at *41 (C.D. Cal., Sept. 17, 2013); *see also* PX1 ¶¶ 86-91 and Atts. EW-FJ (FTC actions regarding same conduct).

Consumer complaints, while not necessary to establish deception under the FTC Act, are illustrative of the advertisements' tendency to mislead.  *FTC v. USA Fin., LLC,* 415 Fed.Appx. 970, 973 (11th Cir. 2011) ("While '[p]roof of actual deception is unnecessary to establish a violation of Section 5, such proof is highly probative to show that a practice is likely to mislead consumers acting reasonably under the circumstances.'").  One consumer was enticed by West Covina Nissan's television advertisement; she twice confirmed the offer and was told there was no catch until she visited the dealership, where she learned that the low payment was limited to the first six months.  PX1 Att. CI at 376.  Similarly, another consumer described how Universal City Nissan pre-approved her for a car advertised at $55 down and $55 per month but then was told at the dealership that she needed a $7,000 down payment.  PX1 ¶ 77b; *see also* PX1 ¶ 77c and Att. CG at 363-65 (describing similar experiences at West Covina Toyota and Kia of Downtown).

7

ii.     **Defendants Have Deceptively Advertised That an Offer is for the Purchase of a Car.**

Defendants also have disseminated numerous advertisements that purport to offer vehicles for purchase when, in fact, Defendants are offering a lease.  PX1 ¶ 30 and Atts. V-X at 123-27, AE-AM at 166-84 (prominently advertising payment terms and only revealing that the offers are for leases, if at all, in the fine print or voiced disclaimers).  For example, in a May 2016 television advertisement, Glendale Nissan touted a "zero down sales event."  *Id.* Att. AE at 00:19.[3]  The visual portion of this advertisement repeatedly emphasized that vehicles were being offered for sale during the "$0 DOWN SALES EVENT," and the audio enticed consumers to "get into this 2016 Sentra for only $109 per month or this beautiful new Altima for only $159 per month. Both with zero down." *Id.* at 00:20-00:27.   The cars were depicted in front of a sign for a "Buy Smart Sales Event." *Id.*  The express claims that the advertised terms were for a "sales" offer were false.  Fine print in white font depicted against a light-colored sales floor revealed that the advertised vehicles with low monthly payments were only available for "well qualified lessees." *Id.*  Thus, despite being advertised as "sales" offers, they are lease offers.  *See supra* at 7 (small print disclosures do not cure misleading impression).  In other instances, Defendants have advertised an original Manufacturer's Suggested Retail Price for a vehicle and a lower "you pay"

---

[3] Ironically, the advertisement begins by spoofing a dealership called "Bamboozle Autos" that—like Defendants' deceptive advertisements described infra at 9-10—is advertising a car for a deceptively low monthly payment.  The salesperson ultimately reveals that the offer requires $15,000 down, and a voiceover then suggests that consumers should not get led astray by these kinds of offers. *Compare* PX1 Att. AE (Bamboozle Autos) *with* PX1 Att. AD at 165 (2015 Nissan Frontier for $139 per month, but the fine-print discloses that the offer requires $15,990 down); *see also* PX1 Atts. AD at 164, AJ at 176-78, AX at 246-48 (advertising with low monthly payments and hidden, high down payments).

amount. *Id.* Atts. AF-AH at 168-72. These claims, however, are misleading: what "you pay" for is not a purchase offer but a pre-paid lease. This fact is not disclosed until well into the fine print. *Id.* The fact that a consumer cannot finance and purchase a car at the advertised terms, and instead can only lease the car at those terms, is likely to affect a consumer's decision, and is thus material. Therefore, the representations in these advertisements are deceptive in violation of the FTC Act. *See also* PX1 ¶¶ 86-91 and Atts. FK-FT (FTC actions regarding same).

iii.   **Defendants Have Deceptively Advertised Offers that Are Not Generally Available to Consumers.**

Defendants also have deceptively presented offers that are not available to the typical consumer in numerous advertisements since at least 2010. PX1 ¶¶ 31-32 and Atts. Q at 112-13, U at 121, AB-AD at 135-65, AN-AX at 186-248. For instance Defendants have prominently advertised payment terms that do not apply to the typical consumer, but only to certain groups of consumers. *Id.* Atts. AN at 186, AS at 205 (recent college graduate with high credit score); Att. AP at 195-96 (recent college grad who qualifies for dealer loyalty programs); Att. AQ at 199-200 (recent college grad and "well-qualified lessee"); Att. Q at 112-13 (recent college grad and military veteran); Atts. U at 121, AA at 134 (high credit score). These limitations, however, are not disclosed except in the fine-print terms, *id.*, or, if listed, that fine print reveals a typical consumer is unlikely to obtain fully. PX1 Atts. AO at 188-92, AR at 203. In other advertisements, Defendants have targeted credit-challenged consumers who are unlikely to qualify for Defendants' offers because the advertised terms are only available to consumers with at least good credit. PX1 ¶¶ 33-37 and Atts. AT-AW at 206-43, AY at 250, AZ at 252, BE at 264 (directing credit-challenged consumers to consider vehicle terms for which the fine-print discloses a high credit score requirement). Defendants also frequently have advertised low monthly payment rates while hiding a high down payment approaching or exceeding $10,000 in the fine print. PX1 ¶ 32 and Atts. AD at 164-

9

65 and AX at 245-48.[4]  Indeed, during the weekend of October 1-2, 2016—after the FTC filed the complaint in this case—Defendant Kia of Downtown prominently advertised numerous vehicles for the attractively low monthly payment of $98.  PX 1 ¶¶ 45-47 and Att. AJ at 176-78.  However, the fine print revealed that a consumer would be required to make a down payment of $9,995 to obtain the vehicle for that low monthly payment amount.  *Id.*

These representations are misleading because they advertise terms that the typical consumer cannot obtain.  *See FTC v. Five-Star Auto Club, Inc.*, 97 F. Supp. 2d 502, 528 (S.D.N.Y. 2000) (finding that for an unqualified claim to be true, it needs to be true for the typical consumer); *Nat. Dynamics Corp. v. FTC,* 492 F.2d 1333, 1335 (2d Cir. 1974) (prohibiting defendant from making "deceptive use of unusual earnings [claims] realized only by a few"); *FTC v. Data Med. Capital, Inc.*, 2010 WL 1049977, at *27-28 (C.D. Cal. Jan. 15, 2010) (finding claims about a high likelihood of success to be false and misleading where they overshadowed disclaimers about no guarantees).  Because the price of an item is likely to affect a consumer's decision to purchase the good or service, these representations are material, *see Lights of Am., Inc.*, 2013 WL 5230681, at *41, and therefore deceptive under the FTC Act.  *See, e.g.*, PX1 ¶¶ 86-91 and Atts. FU-GB at 1165-235 (FTC actions regarding same).

### iv. Defendants Have Deceptively Advertised That That They Will Pay Off a Consumer's Trade-in Even if the Consumer Owes Money on the Existing Loan or Lease.

Since at least 2009, Defendants have deceptively advertised that they will pay off a consumer's trade-in vehicle, even when the consumer owes money on his

---

[4] In addition, some of Defendants' advertisements provide important disclaimers in English, even when the advertisement otherwise is presented in another language such as Spanish, Khmer, or Chinese.   PX1 ¶ 39, Atts. AT at 206, AU at 208-12, and BR-BY at 311-38.

or her previous loan or the lease—in reality, the consumer ends up paying the owed amount. PX1 ¶ 38 and Atts. BI-BQ at 282-310. Indeed, some of Defendants' advertisements have presented an unqualified claim that Defendants will pay off consumers' trade-in vehicles. *Id.* Atts. BJ at 286, BM at 296. Other advertisements have included a subsequent, often remote, disclaimer, such as "[n]egative equity may be added to new loan or lease balance." *Id.* Atts. BK at 290, BN at 300, BO at 303; *see also id.* at Atts. BI at 282-83, BL at 292-94, BP at 305-7, and BQ at 309-10 (claims made once without disclosure and a second time with disclosure). Yet, in fact, consumers later learn that they are responsible for paying the amount owed. *See, e.g.*, PX1 ¶ 77a (consumer complaint that West Covina Nissan falsely advertised that it would pay off any trade-in but actually added the amount to the loan). Whether the Defendants pay off a consumer's loan or lease affects the cost of the transaction and is likely to affect the consumer's decision to purchase or lease a vehicle, and is therefore material. *Lights of Am., Inc.*, 2013 WL 5230681, at *41. These representations accordingly are deceptive under the FTC Act. PX1 ¶¶ 86-91 and Atts. GC-GD at 1237-71, EY-EZ at 925-69, and FE-FF at 1003-19 (FTC actions regarding same).

### 2. Defendants Have Posted and Promoted Deceptive Consumer Testimonials and Endorsements.

Defendants deceptively have posted or promoted reviews appearing on third-party websites, like Facebook, Google+, and Yelp, that purport to be independent and objective but that are written by Defendants' employees, managers, and agents. These phony reviews—written by many of the same employees consumers are supposed to depend on during the sales and financing process—have sought to bolster Sage Auto's reputation and undermine the many negative reviews Defendants have received, including reviews that highlight their unlawful practices. *See* PX1 ¶¶ 50, 70-73 and Atts. CD-CI at 350-76, DY-EB at 537-47.

For example, one sales representative purporting to be objective and

11

independent posted a Yelp review from a Universal City Nissan IP address.  *See* PX1 ¶¶ 51c, 53 and Atts. CL at 387, CU at 430.  The reviewer claimed he had been "researching for months and shopping tirelessly" and that Defendant Universal City Nissan "went above and beyond for me."  PX1 Att. CL at 387.  The reviewer claimed to be a "very detailed informative customer" and implored that "[e]ven if you get discourage because you had or saw a bad review go back and ask for them they dislike to loose customers they will give you an amazing deal."  *Id.* (typos in original).  In fact, the reviewer was Defendants' sales representative.  *See* PX1 ¶¶ 58a, 74b and Atts. DD at 465 (Facebook photos include Yelp photo), ED at 558.

Following a number of negative Yelp reviews about Defendant West Covina Nissan, the dealership's then-internet manager, his wife, and another manager posted five-star reviews purporting to be objective or independent.  PX1 ¶¶ 51g-51i and Atts. CP-CR at 404-12.  The manager's review asserted that a "salesman told me when customers don't get there [sic] price[,] one way they want to get revenge is to put a bad review to taint the reputation of the place."  PX1 Att. CR at 412.  The manager's wife posted another five-star review that same day, which stated "auto dealers have a bad rep and most dealers have bad yelp reviews, I will not let it bother, go inn and ask for Internet department and they will take a good car of you [sic]."  PX1 Att. CQ at 408.  Approximately four days later, another manager posted a five-star review.  PX1 Att. CP at 405.[5]

Other deceptive reviews include but are not limited to:

- Glendale Infiniti's General Manager: "I drove the Q50..... guys this car is going to be a game changer....On a side note  Thanks

---

[5] In all of these cases, the reviewer profiles match other sources of information, including Facebook and LinkedIn and the dealerships' employee listings, which indicate that these reviewers are actually connected to the Defendants.  *See generally* PX1 ¶¶ 51g-51i, 58f, 62, 74a, 74c and Atts. CP-CR, DK, EC, EE.

for taking care of my 2011 G37 Cpe, Thank You Mr. Ong for the deal on service!!!"  PX1 ¶ 51a and Atts. CJ at 379, DV at 528; *see also* PX1 ¶ 51e and Atts. CN at 393, DV at 528.

- Kia of Downtown Internet Sales Manager: "I would like to update my review to state that this dealership is truly exceptional and I really appreciate the way they treat their clients. . . .  I say this from experience, they are super helpful and they care about their clients a lot."  PX1 ¶ 51f and Atts. CO at 401, DW at 531.

- Universal City Nissan sales employee: "What a great deal I gotten here after shopping for months and driving everywhere I finally got the deal that I wanted. . . if you're looking to buy a car please come to the dealership they are respectful of your time and great customer service . . . I love my new ride."  PX1 ¶¶ 51j, 59i and Atts. CS at 419, DN at 500.

Yelp even flagged some of the phony reviews originating from Universal City Nissan's IP address, issuing a consumer alert that "someone may be trying to artificially inflate the rating for this business" and removing the reviews from the business page.  PX1 ¶ 52 and Att. CT at 424.  Numerous reviews that Yelp flagged were written by Defendants' employees. *Compare* Att. CU at 430 *with* Atts. CL at 387, CM at 390.  Notwithstanding Yelp's efforts, phony reviews remain on its site as well as other review sites. *See* PX1 ¶ 51 and Atts. CJ-CS (Yelp reviews); PX1 ¶ 58 and Atts. DD-DN (Facebook reviews); PX1 ¶ 64 and Atts. DP-DQ (Google reviews).

Defendants also have promoted these reviews on their own websites without disclosing the material connections between the reviewers and Defendants.  PX1 ¶ 66 and Atts. DT-DU at 523-26 (landing pages for Universal City Nissan and Kia of Downtown with consumer reviews from

13

ten different online websites).

Defendants have allowed these reviews to remain even after the FTC shared a proposed complaint that alleged this unlawful conduct, and additional phony reviews have continued to be posted. *See, e.g.*, PX1 ¶¶ 51a, 51f and Atts. CK at 383, CO at 396 (phony reviews posted as recently as September 22). Sage Pre-Owned's Facebook page has numerous employee reviews that are deceptive or do not disclose their material connection, including a five-star review by Defendant Michael Schrage. PX1 ¶¶ 56, 59-62 and Att. DB at 458. Similarly, Sage Hyundai's Facebook reviews have continued to include five-star reviews by employees and their social media management company that do not disclose their connections to Defendants. PX1 ¶¶ 56, 59-62 and Att. CZ at 458; PX1 ¶¶ 56-57, 58h and Atts. CZ at 458 (Reputation Review's Tony Ly five-star review: "Sage Hyundai the place to shop for your new Hyundai. Great people and a selection to wow for.. Highly recommended. .").[6]

Defendants have misrepresented these fake endorsements to be independent and objective, and the reviews have failed to disclose their material connection with Defendants. A dealership's online reputation is likely to affect a consumer's decision to visit a dealership and purchase or lease a vehicle there[7] and is therefore material. Thus, Defendants' conduct is deceptive in violation of the FTC Act. *See FTC v. Grant Connect, LLC*, 827 F. Supp. 2d 1199, 1214, 1227-28 (D. Nev. 2011) ("Examples of deceptive conduct violative of the Act include . . . providing false testimonials regarding the defendant's product"); *FTC v. Bronson Partners, LLC*,

---

[6] Reviews Reputation and Tony Ly serve as Defendant Sage Hyundai's reputation management company. *See* PX1 Att. DA at 456 (powered by Reputations Review); *see also id.*, Atts. DC, DM, and EG.

[7] As Digital Air Strike found, 50% of consumers "ranked review sites as the most influential dealership selection tool." *See* PX1 ¶ 70 and Att. DX at 534.

14

564 F. Supp. 2d 119, 125 (D. Conn. 2008) ("[W]hen an advertisement contains a testimonial reflecting the experience of an individual with a product, there is an implicit representation that such experience reflects the typical or ordinary results anyone may anticipate. . . ."); *FTC v. LeanSpa, LLC*, No. 3:11-CV-1715, 2015 WL 1004240, at *10-13 (Mar. 5, 2015) (finding fake consumer comments that were not provided by independent consumers to be material and "deceptive as a matter of law"); *see generally* 16 C.F.R. § 255.5 (material connections between seller and endorser that the audience may not reasonably expect must be fully disclosed).

### B. *Defendants Have Violated TILA and the CLA.*

Defendants' advertisements not only violate the FTC Act but also other federal laws that require clear and conspicuous disclosure of certain terms.

TILA and its implementing Regulation Z, 12 C.F.R. § 226, require that if an advertisement for closed-end consumer credit, such as the purchase or financing of a car, states the down payment or other specific terms ("triggering terms"), the advertisement also must make additional disclosures clearly and conspicuously, including (i) the amount or percentage of the down payment, (ii) the terms of repayment, and (iii) the APR and if the rate may be increased after consummation. 12 C.F.R. § 226.24(b)-(d). Defendants' advertisements routinely have violated these textbook disclosure requirements, including by advertising the amount of a down payment but then failing to disclose or to disclose adequately the APR, or by advertising the term of repayment but failing to disclose the amount of the down payment. PX1 ¶ 40 and Atts. U, BD at 260-61, BK at 289, BZ at 340, CA. These violations often appear in advertisements that violate not only TILA as alleged in Count VIII but also the FTC Act. *Id.* Atts. U, BD at 260-61, BK at 289; *see also* PX1 ¶¶ 87-92 and Atts. EY-EJ (FTC actions involving same conduct).

Like TILA, the CLA and its implementing Regulation M requires that any advertisements offering consumer leases comply with its disclosure requirements. 12 C.F.R. § 213.7. Under the CLA, if an advertisement for a consumer lease states

15

the amount of any payment, the advertisement also must clearly and conspicuously disclose that the transaction is a lease and certain other terms.  12 C.F.R. § 213.7(b) and (d).  Although Defendants' advertisements state the amount of payments, they fail to clearly and conspicuously disclose other required terms, including whether a security deposit is required or even that the advertised transaction is a lease.  12 C.F.R. § 213.7(d)(2)(i); *see* PX1 ¶ 41 and Atts. Q, U, AG, AO at 188-90, BZ at 340-42, CB.  These violations often appear in advertisements that violate not only the CLA as alleged in Count IX but also the FTC Act.  *Id.* Atts. Q, U, AG, AO at 188-90, BZ at 340-42; *see also* PX1 ¶¶ 86-91 and Atts. EW-EZ (FTC actions involving same conduct).

### C.  Corporate Defendants Have Operated as a Common Enterprise and Thus Are Each Jointly and Severally Liable.

Because Corporate Defendants have operated as a common enterprise, they are jointly and severally liable for the consumer injury they have caused.  *See FTC v. J.K. Publ'ns, Inc.*, 99 F. Supp. 2d 1176, 1202 (C.D. Cal. 2000).  Many factors demonstrate the existence of a common enterprise, including common control, shared officers, shared office space, commingling of funds, unified advertising, and whether the business was transacted through a maze of interrelated companies. *See FTC v. Neovi, Inc.*, 598 F. Supp. 2d 1104, 1116 (S.D. Cal. 2008); *J.K. Publ'ns*, 99 F. Supp. 2d at 1201-02; *see also FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1142-43 (9th Cir. 2010).  No one factor is dispositive and all factors need not be present to justify a finding of common enterprise.  *FTC v. Kennedy*, 574 F. Supp. 2d 714, 722 (S.D. Tex. 2008).  Here, Corporate Defendants have exhibited several hallmark characteristics of a common enterprise:  Defendants have common management and control, utilize overlapping employees and outside vendors, such as advertising agencies and attorneys, share business functions, and comingle financial assets.  PX1 ¶¶ 9, 82, and Atts. EL at 614-15, EP at 765-73.

Corporate Defendants have shared managers, principals, and employees. For example, Joseph Schrage, Leonard Schrage, and Michael Schrage are all directors of Sage Downtown, Sage Holding and Sage Management. PX1 ¶¶ 9, 17 and Atts. M at 70-73. Michael Schrage is the manager of Valencia Holding. PX1 ¶ 17d. Michael Schrage is the President, Joseph Schrage is the Vice President, and Leonard Schrage is the Secretary/Treasurer of Sage Downtown, Valencia Holding, Sage Holding and Sage Management. PX1 ¶ 17. Some of the Corporate Defendants, such as Universal City Nissan, Sage Holding, and Sage Management, also have shared office space and business addresses. PX1 ¶ 9.

The entities also have shared advertising materials. All the dealerships are promoted on the internet through Sage Auto Group, including a central website. PX1 Att. EL at 637-40 and 712-22. Indeed, many Defendants have regularly used the same advertising companies. *Id.* (Clockershade and Dealer.com); *see also* Att. M at 84 (Tunuva Media).

Finally, Defendants have shifted money between dealerships to capitalize new ventures or to cover shortfalls at dealerships, have moved profits upstream to a management entity controlled by the three Individual Defendants, and have misappropriated dealership monies to pay for personal expenses, such as private aircrafts, gifts for friends and girlfriends, and to pay for personal financial losses. PX1 Atts. EL at 616-30; EP at 822 ("most business entities are flow thru's" to individuals); GH at 1301 and 1303 (finding evidence of "misused Company funds" and "pay[ment of] extravagant personal expenses).

### D. Individual Defendants Are Liable for Injunctive and Monetary Relief.

Joseph, Leonard, and Michael Schrage are individually liable for both injunctive and monetary relief for the Corporate Defendants' unlawful conduct. Individuals may be liable not only for their own unlawful conduct but also may be subject to injunctive and monetary relief for violations by the corporation. *Stefanchik*, 559 F.3d at 931. Injunctive relief against an individual defendant is

17

appropriate when that individual participated in or had authority to control the unfair or deceptive acts of the corporation.  *See Stefanchik*, 559 F.3d at 931; *Publ'g Clearing House,* 104 F.3d at 1170-71.  In general, an individual's status as a corporate officer of a closely held corporation gives rise to a presumption of ability to control and is probative of an individual's participation.  *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 574 (7th Cir. 1989); *Publ'g Clearing House*, 104 F.3d at 1170-71; *Five-Star Auto Club*, 97 F. Supp. 2d at 538.  "Active involvement in business affairs and the making of corporate policy," including day-to-day oversight of the company's activities, review of sales or marketing strategy, and supervision of employees is demonstrative of both participation and authority to control.  *Amy Travel*, 875 F.2d at 573; *FTC v. Commerce Planet, Inc.*, 878 F. Supp. 2d 1048, 1079-80 (C.D. Cal. 2012).

Here, the conduct of each Individual Defendant satisfies the standards for individual liability for injunctive relief.  Each individual possesses a 33% ownership interest in the Corporate Defendants and shares a role as manager, managing member, principal, and officer of those entities.  *See supra* at 4.  Each thus has held a position of authority with one or more of the Corporate Defendants, and, as corporate officers of the closely held Corporate Defendants, each has had the authority to control the deceptive conduct.  *See supra* at 17-18; *FTC v. Benning*, 2010 WL 2605178 at *5–6 (N.D. Cal. June 28, 2010) (finding individual liability where the defendant owned 30% of the closely held corporation).

Additionally, Individual Defendants routinely have weighed in on and dictated company decisions, including supervising employees and approving the dealerships' deceptive advertising campaigns, and reviewing complaints.  PX1 ¶ 82 and Atts. EN at 731, 739-40; EO at 748-49, 754; PX1 ¶ 43 and Att. CC at 348; PX1 ¶¶ 70-73 and Atts. DY-EB; *see FTC v. Ross*, 897 F. Supp. 2d 369, 383 (D. Md. 2012) (holding that "[a]ctive supervision of employees" and creation or development of the deceptive marketing materials is demonstrative of direct

participation).  In fact, Michael Schrage has served as the general manager for at least Universal City Nissan, PX1 Att. EP at 768 and 799, and directed the rehiring of an employee by West Covina Nissan who had been fired for misrepresenting warranty service claims.  PX1 ¶ 44 and Att. EM at 726-28.

Further, the FTC is likely to succeed in holding all three individuals liable for monetary redress.  Although it is not necessary for injunctive relief, individuals may be held liable for monetary redress if they had, or should have had, knowledge or awareness of the misrepresentations.  *Stefanchik*, 559 F.3d at 931; *Cyberspace*, 453 F.3d at 1202; *Affordable Media, LLC*, 179 F.3d at 1231.  Here, each Individual Defendant possessed knowledge of the violative conduct or, at a minimum, was aware of a high probability of fraud and intentionally avoided learning the truth. *See*, *e.g.*, *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1103-04 (9th Cir. 1994) (finding evidence that defendant "was aware of a high likelihood" that claims were false sufficient to hold him personally liable for monetary relief); *Cyberspace*, 453 F.3d at 1202 (finding that review of deceptive material and evidence of knowledge of complaints was "sufficient, as a matter of law," to demonstrate at least reckless indifference).  The Individual Defendants were aware of the numerous complaints and lawsuits describing Defendants' fraudulent conduct.  PX1 ¶¶ 70-73 and Atts. DY-EB.  Moreover, as noted above, at least Michael and Joseph Schrage have sanctioned the deceptive advertisements or had regular involvement with online reviews.  PX1 ¶ 82 and Atts. EN at 731, 739-40; EO at 748-49, 754; PX1 ¶ 43 and Att. CC at 348.  Leonard Schrage has even received notice from the Los Angeles City Attorney that certain types of advertising were deceptive.  PX1 ¶ 86 and Att. EV at 905-6.  This evidence, thus, demonstrates Individual Defendants' knowledge of the deceptive conduct or at the very least their reckless indifference to it.  *See*, *e.g.*, *Cyberspace*, 453 F.3d at 1202.

**V. A PRELIMINARY INJUNCTION AGAINST DEFENDANTS IS
NEEDED TO HALT DEFENDANTS' ILLEGAL PRACTICES**

*A.  The Commission Is Likely to Succeed on the Merits.*

To demonstrate a likelihood of success on the merits, the FTC need only demonstrate "some chance of probable success on the merits."  *World Wide Factors*, 882 F.2d at 347.  While the FTC need not present evidence at this stage to justify a final determination that Defendants violated the law, the record abounds with such evidence.  For the reasons discussed above, the FTC has established that it is likely to succeed on the merits of Counts I-II and VII-IX, showing that Defendants have violated and continue to violate the FTC Act, TILA, and the CLA.  The FTC also has demonstrated that Corporate Defendants are jointly and severally liable because they have operated as a common enterprise and that Individual Defendants are jointly and severally liable for the unlawful acts.

*B.  The Balance of Equities Favors Injunctive Relief.*

When a district court "balances the hardships of the public interest against a private interest, the public interest should receive greater weight."  *Affordable Media, LLC,* 179 F.3d at 1236 (quoting *World Wide Factors*, 882 F.2d at 347). The public interest is especially strong in enforcing consumer protection laws. *FTC v. Mallett*, 818 F. Supp. 2d 142, 149 (D.D.C. 2011).  Indeed, the Ninth Circuit has instructed that, once the FTC demonstrates a likelihood of success on the merits, "a countershowing of private equities alone does not justify denial of a preliminary injunction."  *FTC v. Warner Commc'ns, Inc.*, 742 F.2d 1156, 1165 (9th Cir. 1984).

The public equities—protection of consumers from Defendants' deceptive conduct and effective enforcement of the law—weigh heavily in favor of granting the requested injunctive relief.  Defendants' conduct indicates that they will likely continue to deceive the public.  *Five-Star Auto Club*, 97 F. Supp. 2d at 536 ("[P]ast illegal conduct is highly suggestive of the likelihood of future violations.").

20

Indeed, Defendants' law violations have persisted even in the face of repeated governmental notice that the conduct is unlawful. Defendants have continued their deceptive advertisements after receiving notice from the Los Angeles City Attorney in November 2013 about misleading advertising. PX1 ¶ 86 and Att. EV at 905-905. The conduct has persisted despite the FTC's many law enforcement actions for the same conduct. *See* PX1 ¶¶ 87-92 and Atts. EW-GD. And, Defendants have remained undettered notwithstanding knowledge of the FTC's investigation, receipt of the FTC's draft complaint around February 1, 2016, and even the filing of this action. *See* PX1 ¶¶ 10 and 25.

In contrast, any private equities are not compelling. "[T]here is no oppressive hardship to defendants in requiring them to comply with the FTC Act, refrain from fraudulent representation or preserve their assets from dissipation or concealment." *World Wide Factors*, 882 F.2d at 347. Courts within the Ninth Circuit have consistently found that the public interest outweighs a party's ability to advertise deceptively; indeed, "the public interest in preventing further consumer deception outweighs [d]efendants' private interest in continuing to advertise and market its products and services in the same manner." *See John Beck Amazing Profits, LLC*, 2009 WL 7844076, at *16; *FTC v. City W. Advantage, Inc.*, 2008 WL 2844696, at *6 (D. Nev. July 22, 2008) (noting that "[t]here is no hardship to [defendants] in requiring them merely to follow the law-to refrain from making misrepresentations to consumers they contact"). The balance therefore tips strongly in favor of a preliminary injunction.

Because the FTC is likely to succeed in proving that Defendants are engaging in deceptive and unfair practices in violation of the FTC Act, TILA, and the CLA, and that the balance of equities strongly favors the public, preliminary injunctive relief is justified.

*C. The Scope of the Proposed Preliminary Injunction Is Necessary and Appropriate in Light of Defendants' Egregious, Unlawful Conduct.*

To protect consumers and to preserve the Court's ability to award effective final relief, including restitution to injured consumers, the FTC requests that the Court issue a preliminary injunction. *See* Proposed Preliminary Injunction Order ("Proposed PI"). The Proposed PI is tailored to prohibit Defendants from using the deceptive advertisement (§§ I-IV) and endorsement (§§ I.E, II.C, and V) practices described herein. Courts routinely have granted preliminary injunctions in FTC cases involving deceptive advertising. *See supra* at 2-3 (citing FTC cases granting temporary or preliminary injunctive relief). The Proposed PI also includes provisions addressing disabling deceptive reviews (§ V), record preservation (§ VI), notice of certain financial transactions, new entities, and litigation (§ VII), order distribution and service (§§ VIII-X), and retention of jurisdiction by the Court (Proposed PI § XI). If Defendants' unlawful activities continue during the pendency of this case, consumers will continue to be deceived.

Because Defendants have posted deceptive reviews that remain on third party websites, Section V of the Proposed PI would require Defendants and any such third parties to disable public access to existing reviews that would violate Sections I.E. or II.C of the Proposed PI (defined as "Deceptive Reviews"). An order binding third parties is necessary because Defendants may not be able to disable access to the deceptive reviews pursuant to the third parties' terms of service ("TOS"). *See, e.g.,* PX1 Atts. CX (Yelp TOS) at 445, DO (Facebook TOS) at 500, and DR-DS (Google TOS) at 513 and 518. Courts have, on numerous occasions, entered such orders requiring disabling public access of deceptive internet content. *See supra* at 2-3 (citing orders); *FTC v. Cornerstone and Co.,* No. 1:14-cv-01479-RC, slip op. (D.D.C. Aug. 29, 2014) (TRO disabling website access); *FTC v. Stuffingforcash.com Corp.*, No. 1:02-cv-05022-CRN, slip op.

22

(N.D. Ill. Aug. 26, 2002) (PI disabling website access); *FTC v. Cantkier*, No. 1:09-cv-00894 (CKK) (D.D.C. May 15, 2009) (TRO disabling online advertisements).  The requested relief is likewise necessary here to protect consumers from ongoing deception.

Courts have routinely required record preservation in FTC cases involving deception.  *See*, *e.g.*, *supra* at 2-3 (citing orders).  It is appropriate to enjoin Defendants charged with deception from destroying evidence and doing so would impose no significant burden.  *See SEC v. Unifund SAL*, 910 F.2d 1028, 1040 n.11 (2d Cir. 1990) (characterizing such orders as "innocuous").  Such a provision is particularly necessary because Defendants have demonstrated a willingness to flout the law.  During the FTC's investigation, Defendants have failed to preserve and produce even basic evidence required by the CID.  PX1 ¶¶ 18-24 and Atts. O at 104-05, P at 108-09.  Indeed, Defendants have admitted that, other than email on their own computers, they are "not involved in the preservation of emails on any email servers," such as their agents that host their email or their employees' use personal email addresses and cell phones for business purposes.  PX1 ¶¶ 23-24 and Att. P at 108-09.  For instance, Defendant West Covina Nissan has destroyed relevant material in other court proceedings.  *See* PX1 ¶ 80 and Att. EJ at 591-93 (imposing spoliation sanctions).  And, according to a court-appointed independent examiner in state court litigation, some Defendants have made false statements and fabricated documents.  PX1 ¶ 83 and Atts. ER at 839-42, ES at 850-52, ET at 874-75.  Similarly, Nissan North America has found that at least one Defendant "invented" warranty and repair claims "out of whole cloth" as part of a "massive scheme to defraud" NNA.  PX1 ¶ 84 and Att. EU at 878-79.  Given Defendants' brazen disregard for the law, there is a sizeable risk that Defendants, their employees and agents are not preserving important evidence.  The record preservation provision will help ensure that relevant evidence is not destroyed.

The notice provisions are necessary to guard against the dissipation and

23

diversion of assets that may be used for final relief.  When a district court determines that the FTC is likely to prevail on the merits, it has a "duty to ensure that. . . assets . . . [are] available to make restitution."  *FTC v. World Travel Vacation Brokers*, 861 F.2d 1020, 1031(7th Cir. 1988).  As a California state court recently found in issuing a preliminary injunction involving Defendants, Defendants have been self-dealing, including significant "personal expense abuse." *See* PX1 ¶ 81 and Att. GH at 1300.  Defendants nonetheless have flouted the court-issued injunction by continuing to engage in prohibited conduct—going so far as to make false statements and fabricate documents to the court-appointed examiner to disguise the unlawful transactions.  PX1 ¶ 83 and Atts. ER at 839-42, ES at 850-52.  In FTC cases involving potential asset dissipation, courts have ordered asset freezes, accountings, and financial statements.  *See, e.g., supra* at 2-3 (citing orders with such relief); *see also The Wimbledon Fund, SPC v. Graybox, LLC*, 2015 WL 5822580, at *5 (C.D. Cal. Sept. 29, 2015) (discussing authority for asset freeze). Here, in light of the Defendants' business operations, the FTC has tailored the notice provisions to require notice if Defendants make certain monetary transfers for non-business purposes or are involved in litigation affecting their financial interests, to allow the FTC to seek further relief as necessary.

The Court also should enter the new entity reporting requirement (Proposed PI § VII) because Defendants have continued to establish new dealerships and entities, including dealerships that have quickly began receiving complaints about unlawful conduct.  Indeed, Defendants formed Covina Chevrolet, Sage Pre-Owned, and Sage Hyundai during the FTC's investigation, but did not disclose their existence to the FTC notwithstanding a Civil Investigative Demand legally requiring production of this information.  PX1 ¶ 18.  The *Schrage* litigation also indicates that certain Defendants may be creating more new entities:  "[o]ver the past several weeks, Leonard has learned (as has the Examiner appointed by Judge Chalfant) that Michael and Joseph have secretly opened several new entities under

the 'Sage' banner and have transferred Company funds there in plain violation of Judge Chalfant's injunction. . . ."  PX1 ¶ 82 and Att. EQ at 833.  Under such circumstances, courts in cases alleging FTC Act violations have granted similar, and often more extensive, relief.  *See*, *e.g.*, *supra* at 2-3 (citing orders).

Courts often require order distribution, correspondence, and service provisions in FTC cases.  *See id.*  Defendants and their employees appear to use personal e-mail and cell phones for business purposes, PX1 ¶¶ 22, 58a, 72 and Atts. O at 105, DE-DF, EA, and provisions requiring circulation and acknowledgment of the order would ensure that Defendants and their employees and agents preserve any business-related evidence in their possession.

## VI. CONCLUSION

Like the fictitious dealership "Bamboozle Autos" depicted in one of Sage Auto's recent advertisements, *see supra* at 8 n.3, Defendants have been bamboozling consumers with misleading advertising and fake online reviews.  As a result of this conduct, Defendants have caused and likely will continue to cause substantial public injury by violating the FTC Act, TILA, and the CLA.  The FTC requests that this Court grant the FTC's Motion for Preliminary Injunction to protect the public from further harm and to ensure effective relief to those harmed.

Date: October 6, 2016                          Respectfully submitted,


                                               /s/ Daniel Dwyer
                                               Thomas J. Widor
                                               Daniel Dwyer
                                               Thomas J. Syta

                                               Attorneys for Plaintiff
                                               FEDERAL TRADE COMMISSION

25